Joe Kendall If I mispronounce the name of your client you can correct me. I believe he pronounces it Musacchio. Musacchio, alright. Joe Kendall along with my partner Jody Rudman on behalf of appellate Michael Musacchio. May it please the court. There are two main topics I would like to take up with the court this morning. I don't want to obviously rehash anything in the brief but I want to take up two major areas. One is the charging error we point out in our brief along with what we believe is sentencing error committed by the trial court. The charging error in the jury charge charges two different ways of committing an 18 U.S.C. 1030 violation. Both by unauthorized access and by exceeding authorized access. It is our contention from the indictment to the record itself from the questions asked to with the answers given to the post-verdict activity of letters being written by the government. The pre-sentence report and indeed the judgment itself all show that this is an unauthorized access case. Nevertheless, the jury charged the third iteration of it. Okay, but isn't it true that Brown had access. He just exceeded the access that he was authorized to have while he was still with the company. That is incorrect under this record. He had at the time Musacchio left been removed from the god of IP, had been taken out of that position. And I believe, I don't recall now from the record, but it was a year before. That is why during the preparation of this case the government in their preparation for trial figured that out. And that is the reason and the only reason for the third superseding or second superseding indictment, the third indictment in this case, dropping the exceeding authorized count. The trouble with this case and I think what went wrong was the district court took one of the earlier proposed jury instructions and that's what they gave the jury. That's the only thing I can conclude. Yes. Brown has access to the company's computer system and he exceeds that authorized access by going where he's not supposed to go. Why isn't that a fair characterization of what happened while Brown was still at the company? Because he did not have the company's authorization to go where he went. So it becomes – He exceeded his – he wasn't some teenager in a basement hacking into a company. Okay, that's a totally unauthorized access. Correct. He's a guy who has access to some part and I realize that it's hard to visualize a computer system because it's somewhat intangible, but he has access to some one room in the building and he goes into another room so that exceeds his authorized access. He wasn't a trespasser in the building. He's a trespasser in the part of the building. Why isn't that a way to characterize the evidence? I agree not necessarily the only way, but a way to characterize the evidence sufficient to sustain the jury verdict. All I can say to that is that is a way that was foreign to the district court, the prosecution, the questions that were answered, the pre-sentence report, as well as the government's position that they took in a letter post that doesn't – it's in the record – doesn't to the district court, doesn't Masaccio realize that this is an unauthorized case. He was convicted of unauthorized use and that's the reason for – Of course, his counsel understood that. Were you the counsel at trial? I was not. Well, as I understand it, no objection was made by defendant's counsel to the instruction. That is correct. It just apparently was at worst was a clerical mistake. And no objection was made by the defendant. That is – I fully recognize and accept that the argument I'm making is subject to a plain error reviewed by this court. It is my position that it affected his substantial rights because everyone in the room was on one page except the jury who got this charge. No one got the memo that that's what this – But if we're talking about affecting substantial rights, it doesn't really matter who's on what page. The question is, is this something supportable? And I'm saying if you were allowed to come into my house, you could come into my living room, and you started wandering around my bedroom, well, then you've exceeded the authorized access. But you're not wholly a trespasser the way that some other – some guy that breaks into my house that I don't even know is. And that's the distinction with Brown. He's actually both because he's at the company, he's exceeding authorized use, he leaves the company, and he is totally an authorized user. I don't find that something so ridiculous of a construction of this record as to exceed the substantial rights of Mr. Musacchio. I don't necessarily agree with that, but you have articulated, Judge, this very problem that exists in this area of the law with this circuit split. Do you have the broad view that collapses unauthorized use into – or collapses exceeding authorized access into authorized use? Therefore, everything becomes an unauthorized use if you go – if you say that going into that room withdraws that authorization. So the two be melded. Authorized has to mean something different than unauthorized. If I'm a teenage kid hacking into, you know, the Bank of America or something, that's an unauthorized use. But like in John, she's on the computer system legitimately, but she's doing – she's going into an area that she's not supposed to because she's not supposed to be checking that guy's credit card screenshot or whatever. She's doing it to help her friend that's going to steal the credit card information or whatever the details were. And so that's – the idea of exceeding authorized means you have to be in the House rightfully in the first place. That you have put your finger on the precise problem with ways courts, beginning with the First Circuit and the Seventh Circuit, who have a broad read on this statute, to the Ninth and the Fourth, who have a narrow read on it. When you start looking at the use to which the information that is purloined is used, then you have a different situation than a reading of the statute that is narrow. And what does it specifically say? It specifically says, according to the Ninth Circuit en banc, we're going to look at the access, the material with its access, irrespective of its use. John has, as you two well know, Judge Haynes, Judge Smith, John has a different finding that's really different from the broad view and the narrow view in that it is, I would contend, a middle ground in that it has to be in furtherance of a crime. But what is very interesting about that opinion is the language that is used wherein the issue is resolved and, quote, it may, and I would read the word, I read the word from this court, may in the key of G, it may, at least when the user knows or should know she is not authorized to access a computer and obtain information in furtherance of a crime. Now, the question for this court is, do you expand the requirement of a criminal finding, which there was not in this case. The government could have chosen to indict, as is suggested in the response brief, could have chosen, if they wanted to, to indict for some other collateral crime, but they did. Theft of trade secrets comes to mind, but they did not do that. So you have to decide whether, if you decided on the basis of exceeding rather than what we contend, it's an unauthorized access case from start to finish in the evidence that was presented and what the judge did and what was found in what the judgment actually says. That's what kind of case this was. In this case, and we don't, I mean, there's all kinds of other hypotheses we could come up with, but in this case your argument means that whether Brown's at the company with a legitimate login and password versus he's left the company and now he doesn't have a login and password anymore, it makes no difference. It's all unauthorized, and it's not a different analysis at all, and that makes no sense to me logically. If I'm at a company and I'm legitimately somebody who can access their computer system versus I'm just some person on the street, you know, the teenage hacker hypo, I don't understand how you can say that that is the same thing, the statute. You have to have some interpretation that differentiates those two, and it will come down to whether you put a broad read on the statute or whether you put a narrow read. I would say right now the Fifth Circuit is kind of a middle ground here, and I was talking to my colleague before we started that when you read these cases, when you read that statute and read these cases, it's almost mind-numbing, and courts are all over the map, which would indicate to me that the statute's ambiguous. When you have respected courts all over the country that all over. . . This case to me doesn't seem to lend itself to any sort of confusion or ambiguity, and, I mean, the fact that you could potentially hypothesize a situation that creates a problem doesn't mean you have it. Here, Brown, it seems, is tailor-made to be an and. And I actually read the jury instruction a little different. I think he's saying it is a crime to do that, not necessarily that you have to show both prongs, but you all haven't made that argument, so I'll leave that be. But he seems to be the two-pronged guy, the quintessential two-pronged guy that we fairly rarely have. I mean, it's kind of rare that the teenage hacker also is an employee at the company for a while or whatever. I would disagree with you, Your Honor. You cannot exceed what you do not have. If you don't have authorization, you can't exceed what you don't have. In your theory, you really can't ever exceed. No. Well, I don't know. When would Brown have exceeded his authorized access? Would he? I'm not sure I'm following. When would he? You have made the exceeding authorized access nugatory, and I'm trying to understand what life you think it has, given your analysis, that any time you go anywhere you're not supposed to go, it's automatically unauthorized. So then what does exceeds authorized mean? What I think it means, I would argue it means what the Fourth Circuit and what the Ninth Circuit said, and I don't think you have finally decided that. You leave room with the word may, and it's only in furtherance of a crime, and you can choose to go there or not. But you need to look. You go down a rabbit trail that leads you with an ambiguous statute, and my argument is by the very fact of these splits, you've got an ambiguity, and it leads you headlong into a skilling situation, which counsels against a broad read on an ambiguous statute. You're not there yet. You can choose to go there and cast your lot with the First and Seventh. But to me, and I've got to be honest with you, I'm going to say this tongue-in-cheek, I never thought I'd see the day when the Ninth Circuit on Bach would be accused of being a bunch of strict construction literalists. But that's the position that they take, and that is we're not going to worry about what the use is. We're going to look at whether or not the one or the two, were you authorized, and that's an internal hack, or were you not authorized, a so-called external hack? Are you the kid coming in from the— We're running out of time, so talk about the loss calculation, if you don't mind. The loss calculation is pulled out of thin air in my judgment. You can look at page 20 of our reply brief, and you see the judge, he had several sentencing hearings, and he did not accept, and he was troubled by both the—by the government's position and even the probation department's position. He opined that it had to be tied to the hack. And the only evidence that you have that is anchored in anything are the expert opinions that pegs at it somewhere around a couple hundred thousand dollars. I don't have committed to memory what that is, and it is what is the actual harm, the remediation costs that were involved in paying for what he broke, which brings me to the— and you see it, the $1 million, he says—he finally says to the witness, Shields, who's testified five separate times to different loss amounts, and he says, don't you realize I can't give you punitives? And he says that—or the judge said, you realize that? And then the guy with the light bulb goes off and he says, well, it's just $1 million. But there's no explanation of where that number came from. Indeed, the government in their argument said, and we cite this in the brief from the record, said we cannot tell you how to parse this out. And so we think the judge just plucked that number, and it should be the cost the experts testified, which goes to the rules of construction that the Sentencing Commission passed in 2003, I believe, in response to the—in response to a directive of Congress for them to look at this issue. And they have carved out—you've got the lost tables, and they have its own set aside, carved out for three specific crimes, which this is one. And that's why we ask for oral argument. We think it's a first impression. What did the Sentencing Commission mean by those rules of construction? You would say that's a de novo question of law? I would. I would. Not a finding of fact by the— No. You've got an easy way and a hard way to resolve both of these issues. On count one, it's an unauthorized case. The jury was wrongly charged. Or you can dive off into a writing about exceeding. On this issue, our position is the only evidence—and here's another layer on it. Where did count three, three months, come from? If the judge got the loss correct, count three, three months—now, don't get me wrong. We're happy with count three at three months. But—and we didn't appeal on that. But that is plucked out of the air as well, just like the million-dollar loss was. The judge was applying equity, which he could have done easily in a 3553 analysis, but he chose to make this a within-guideline sentence. You've saved time for rebuttal, Mr. Kendall. Thank you. Thank you. Okay. Thank you. May it please the Court, Brian McKay on behalf of the United States. Mr. Mosacchio has raised several challenges to his three convictions and their sentences, but I intend, too, to focus my time on two of those issues, the same two issues, the sufficiency of the evidence of exceeding authorized access to a computer and also the loss amount, the reasonable estimation of loss that was constructed by the district court. Okay. How do you—we've heard Mr. Kendall refer us to the fourth and ninth, so I guess you're going to refer us to the first and seventh. But can you articulate the difference between exceeding authorized and unauthorized? I can. And I would first point the Court to the fact that it doesn't need to go any further than the statutory definition of the term, which is at Section 1030e6, where Congress said exceeding authorized access is accessing a computer with authorization. And then using that access to obtain or alter information in the computer that the accessor wasn't entitled to obtain or access. That even under the Ninth and Fourth Circuit standards, what Roy Brown did or what the conspirators did through Roy Brown's authorized access, as Judge Haynes, as you've perceived, falls squarely within what it means to exceed authorized access. Because even the Ninth and the Fourth Circuit have perceived this, what I would term—not in terms of broad and restricted, but in terms of dimensions. The Ninth and Fourth Circuits have recognized this spatial dimension, as the Court has pointed out in talking of going into a house. In BRCA, the Ninth Circuit said that what that means, exceeding authorized access, is having permission to access a computer, but accessing information on the computer that the person's not entitled to access. And that's precisely what Roy Brown said that he did. It was also corroborated by the president of the company and the general counsel of the company, who, when presented with specific emails, verified Roy Brown didn't have authorization to access this information. It was corroborated by company policy, and specifically referring to Exhibit 18, page 3, paragraph 8, where the company told its employees, you're not authorized to access or read emails that weren't sent to you. And also by Levi Richardson, Brown's successor— But Mr. Kendall says that's just plain old unauthorized access. It can't be unauthorized access, because Brown testified, yes, while I was an employee, I was permitted to be on the system. So you're allowed in the house, but you're just— Correct. Exactly. I think of it in terms of I'm authorized to use the U.S. Attorney's Office, the office generally. I don't think I'm authorized to go into her office, the U.S. Attorney, and go through her files. But if I was to do that, certainly I would be exceeding the authorization that I have to be in the offices of the United States Attorney. And similarly— As opposed to just somebody just walking in the U.S. Attorney's Office that doesn't work there, doesn't have a badge— Precisely. —or whatever. Precisely. Now, that dimension, that physical, spatial dimension is, I think, uncontested. It falls squarely within the wheelhouse of the statutory definition. Now, this court has gone further, and like other courts, including the Eleventh Circuit and Rodriguez, has recognized a second dimension, what I would term as sort of a functional dimension. And I point to John, drawing from page 272, where the court said, Access to a computer and data that can be obtained from that access may be exceeded if the purpose for which the access has been given has been exceeded. Now, even setting aside Roy Brown and what he did in exceeding authorized access, in the interest of being thorough, I've pointed the court to what Kim Shipp did. She was the executive assistant to Masaccio and then later to others at ETS when he left. And what she did meets this court's understanding of the second dimension of exceeding authorized access. She was authorized to access ETS system. And, in fact, the record suggests that she was authorized to access Steve Bowers of VP's emails, but she was never, never authorized to access that information for the purpose of mining it for competitive information that she could feed to Masaccio for him to use to the company's detriment. Now, the court doesn't even need to reach it here because, as I said, Roy Brown's conduct falls squarely within the definition. And if the bar was set higher than it had to be and the government had to prove both goals of this conspiracy, the evidence shows that it clearly did so. Why don't you make the argument I did that actually in defining it he's just saying these are violations of the statute, which is true, and that the conjunctive simply means that they are both violations, not that you have to prove both? Because I thought, frankly, and the court may disagree in hindsight. I have some disagreement myself. But I thought it was easier this way because it's – Easier to wade into a circuit split? It is apparent from – The definition of easy is – I understand. I appreciate that, Your Honor. I think that on this record Roy Brown did precisely what is prohibited by the statute. And so I thought there was no need to argue about whether the jury instruction meant this or that. Now, I submit that looking at it, when the jury instruction says, I agree with Your Honor, Judge Haynes, that that's what the jury was charged. And as a matter of logic, when it says this statute prevents a person from doing A and B, when A and B are logically exclusive, mutually exclusive, they can't coexist, then logic would tell you that they weren't charged in the conjunctive. But be that as it may, if the bar was set high, I'll accept that, and I think our proof readily discharges that burden. What do you consider the standard of review to be for this claim that both elements of the statute were, and they were, mentioned in the instruction? I think it would be plain error because neither – I don't see you making that contention in your brief in your 77 pages. But, you know, you really do need to be more specific in your brief on each issue stating what the standard of review is right up front. Do you do that in your brief? I can't find it. I appreciate that, and I apologize. Now, he did separately – Do you do that in your brief? I believe so, Your Honor. I couldn't find it, so I'm looking again. Okay. It wasn't in the first issue. In the second issue, he clearly parses it out as – It is in the first issue because no objection was made to this clerical error at worse. Right. And he did make an objection, a separate objection, to the instruction. And I think, as I noted in the brief, I think it's not perfectly clear, but I think that he is raising that argument, that error, in his second issue. I believe that he framed it as a second issue. I remember in his second issue he says a unanimity instruction should have been given for conspiracy, correct? Correct. But then he also – Back to my original question on this stating both elements of the statute. Do you think it's plain error of standard of review? I do. And if it is plain error of standard of review, arguably we'll say it was a clear or obvious error to satisfy the first prong. So how did it not affect his substantial rights? Again, because of Brown? Yes. All right. Thank you. How can you defend this kind of vague, you know, not more than 1 million sort of – Certainly. I understand there's a range, but even though – and I understand the judge doesn't have to be able to, you know, get it down to a precision with pennies. I mean, all that law I completely understand, but shouldn't the judge at least be able to articulate a rationale for a number? Yes, and I believe he did. We know that the court's review of the loss amount is really in two parts. First, the methodology, and second, the calculation. With respect to the methodology, it's clear that what the district court was attempting to do was find that discrete or finite number of agents who left the company because of the hacking. You reduce that to business loss or economic damages and then add to it the $239,000 of remediation damages, the cost that ETS incurred in investigating and fixing the breach itself. But after sitting through two weeks of trial and holding two hearings on the loss amount issue and hearing from the company president, from ETS's president, from TTS's attorney, from two experts retained by Mr. Musacchio and by the lead agent, it became apparent to the court what the government and, frankly, the defendant had told the court. And that was that this, because of its very nature, this was not a number, the number of agents who left because of the hacking, wasn't something that could really be parsed out. And I think that the best pattern for this court in this case is its prior decision in the United States versus Hebron where the court recognized, first of all, the amount of deference that is shown to the district court in constructing that reasonable estimate of loss. But in Hebron, the court was similarly faced, the district court was similarly faced with an issue where there was an amount of money. And that amount of money contained an amount that resulted from the offense and some that didn't, that would have occurred anyway even without the offense. And because of the prevalence of that offense and the inability to be able to deconstruct that number, the court recognized that the district court can adopt that full amount absent any proof by the defendant as to what that deconstruction parsing out should be. And similarly here, because of its very nature of what this hacking scheme was, it didn't lend itself to breaking apart. And I think, something I didn't fully appreciate when I wrote the brief, but in preparing for argument, I would ask the court to take a look at the district court's comments at 2953 of the record where after hearing all of this evidence, taking a break and coming back, I think, and I would encourage the court to read it and see if it agrees with me, but I think what Judge Lease was saying was after hearing all of this, I now understand the government's position, what it's been all along, and that is that the hackers used this information to further all of their breaches of civil duties and to further this whole thing. So in some respect, it didn't matter whether someone, an agent, would have remained or not. And I would add that Jim Shields, TTS attorney, noted his or their, the TTS's concerns that some of the hacking even facilitated. Those who would have left anyway, this seemed to have facilitated their departure so that they left earlier than they normally would have. And so I think, using Hebron as a pattern, I think it was reasonable for the court to take a number of economic damages that was developed through arm's length negotiation, and really, not even that. I think the reasonableness of what the court did is underscored by the fact that the court adopted an economic damages model that was developed by a party that was adverse to the victim. He didn't simply adopt the victim's calculation, but this party that was adverse to ETS was the one that actually developed this million dollars or less number, and he adopted that number. A couple of things that I want to dispel, some items that are left hanging about the calculation that are addressed in the reply brief. First of all, Mr. Shields, TTS lawyer, never testified that $134,000 was the full economic or business loss damages in TTS's view. Instead, what he said is that that amount of money was paid to ETS related to the loss of one customer. And although his testimonial on that issue did become muddled after he had continued testifying on it, but perfect clarity was brought to that issue by an AUSA at page 2951 of the record, where she stood up and she brought clarity to that issue, explaining to the judge that number related to simply the loss of one customer, not the entire stable of agents. Can I ask you something about the results here? Obviously, if we affirm, we know what that means. If we were to reverse on the sufficiency of the evidence, that would be a reverse and render a judgment of acquittal, right, because you can't retry it if there's a problem with the sufficiency of the evidence. Whereas if we reversed on a jury charge error, it would be a reverse and remand for a new trial. Just tell me what you believe the outcome is, depending on what we do with the challenges to the conviction. As I stand here, that is consistent with my understanding. Okay. And then obviously if we reversed on a sentence, it would be just leave the conviction in place, vacate the sentence, send back a re-sentence. Correct. The other thing I want to dispel about the calculation of the loss amount is this notion that the $9 million between TTS's economic damages model and ETS and the $10 million settlement amount was somehow punitive damages. That's not supported by the record. Of course, Mr. Shields said that they were concerned about punitives, but that is not what he said that $9 million was about. Instead, it was about the difference between the two economic models of economic damages. Unless the court has any additional questions, I would cede the rest of my time. All right. Thank you, Mr. McKay. Mr. Kendall, you saved time for rebuttal. Could you briefly address the outcomes? Of course, we know, like I said, what an affirmance is, but would you address what the outcomes are if we were to agree with some but not all of your arguments? I would contend it would be a reversal and a retrial, not a reverse and render. And that's not the position I prefer, but I think that's the accurate one for charging error. And I would like to address – I'm sorry? Do you agree there would be reverse and retrial if we reverse on the sufficiency? No, Your Honor, now that I think about that. With regard to the charging error, no. I have to agree I was wrong when I made that statement, that you would. I thought the law was that if you find that there was insufficient evidence, double jeopardy would attach, and you couldn't retry the guy. That's correct. If the problem was the jury charge, then you could retry him. But you're the attorney for the defendant. You have to make your argument, and we'll look at it if we should end up reversing. Obviously, if we affirm, this doesn't matter. But sometimes lawyers don't pay enough attention to what are the different outcomes, depending on what they're arguing for. And I want to be sure I know what your position is. The clock isn't moving. It's true. Anyway, go ahead. I don't think I'm going to be here that long anyway. With regard to rebutting what he said, which was not a lot new that I haven't heard, I think that where we're going here is we are now on an appeal trying a case that the jury didn't try. And that flows into the plain error concern that I know that this court has, or at least I've sensed that from some of the questions that have been asked. I do know that he wasn't tried for going into another room. All of the record evidence, all of it, is that this was an unauthorized access. That's the purpose of the superseding indictment. The government changed its theory of the case, and that's the questions that they asked. The jury charge, even though unobjected to, allowed him without a specific unanimity instruction on those two different ways of committing this crime, doesn't tell us which one the jury convicted him of because if they found that he exceeded, it's our position that there was no crime, and that's the law in this circuit, which is what I have to deal with since that is absent. We don't know, and we're left to guess which one he was tried on. So it's just that simple. And that's really all I have to say about that unless there are more questions. Thank you, Mr. Kendall. Your case is under submission. Thank you.